Filed 6/27/25  Benjamin Moore & Co. v. Cal. Regional Water Quality etc. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.F

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| BENJAMIN MOORE & COMPANY, INC., <br><br> Appellant, <br><br> v. <br><br> CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, LOS ANGELES REGION, <br><br> Respondent. | B335989 <br><br> (Los Angeles County Super. Ct. No. 22STCP00715) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mitchell L. Beckloff, Judge.  Affirmed.

Crowell & Moring, Emily T. Kuwahara, Ahnna L. Chu, Eric. S. Aronson for Appellant.

Rob Bonta, Attorney General, Tracy L. Winsor, Assistant Attorney General, Jennifer Kalnins Temple, Supervising Deputy Attorney General, John S. Sasaki and Kaylee J. Kinter, Deputy Attorneys General, for Respondent.

_____

In 2015, the California Regional Water Quality Control Board, Los Angeles Region (Regional Board) discovered that two wells in the City of Commerce were contaminated with the volatile organic compounds (VOCs) trichloroethylene (TCE) and tetrachloroethylene (PCE)[1], which are considered toxic and hazardous to human health.  The Regional Board ordered Benjamin Moore & Company (BMC), which from 1953 to 2002 owned and operated a latex- and paint manufacturing facility near the contaminated wells, to disclose what waste had been buried when the facility was decommissioned in 2001 and to submit a work plan for a complete site assessment.  BMC petitioned the State Water Board (State Board) to review the Regional Board's order, but the State Board took no action and the petition was denied by operation of law.  BMC then initiated mandate proceedings in the superior court, seeking a writ directing the Regional Board to set aside its order.

After denying BMC's motion to augment the administrative record with materials not considered by the Regional Board before issuing its order, the trial court found that the weight of the evidence supported the Regional Board's suspicion that BMC had potentially discharged waste that could affect the quality of water in the region, and the burden of the order bore a reasonable relationship to the Regional Board's need for it and the benefits to be obtained.  The court therefore denied BMC's petition.

---

[1] "Ethene" is the International Union of Pure and Applied Chemistry name for eth*yl*ene.  Tetrachloroethene is thus another name for tetrachloroethylene, also known as "perchloroethylene" and abbreviated as PCE.  (See *City of Modesto v. Dow Chemical Co.* (2018) 19 Cal.App.5th 130, 137.)

BMC contends that (1) the court abused its discretion when it denied BMC's motion to augment the record and (2) no substantial evidence supports the court's order, which was impermissibly based only on speculation.

We disagree with the contentions and affirm the judgment.

## BACKGROUND

## I. Facility Use and Inspections from 1953 to 2020

### A. BMC's Operations (1953-2002)

From 1953 to 2002, BMC operated a paint manufacturing facility on a roughly four-acre site in the City of Commerce (the Site), where it manufactured paint, latex, and solvent-based coatings. The Site was situated at an elevation of approximately 150 feet above mean sea level, in surface topography sloping gently southwest toward the Los Angeles River, located approximately 1.5 miles southwest of the Site.

The Site housed batch mixing, "letdown," and holding tanks; containment areas containing 23 aboveground storage tanks (ASTs) for bulk storage of raw materials; a 6,000-gallon underground storage tank for vinyl acetate storage; a drum storage area; a 2,500-gallon spill retention/clarifier tank; and other facilities. BMC decommissioned the vinyl acetate underground storage tank in 1983, when it was emptied, filled with cement, and closed in place.

BMC's facility lies within the Regional Board's jurisdiction.[2]  The area surrounding the Site is industrialized, with four nearby manufacturing facilities.

The Site had no reported spills, releases, or enforcement actions.

BMC ceased paint operations at the Site in 2002, decommissioned the facility, and sold it to G.F.C. Garfield Associates, LLC (Garfield) which, according to BMC, uses the Site for warehousing.

As described below, beginning in 1999, BMC commissioned several environmental assessments of potential areas of concern at the Site, and several third parties conducted their own assessments.

### B.    Environ Environmental Assessment (1999)

In November 1999, BMC retained Environ Corporation (Environ) to conduct an assessment of the Site to identify environmental issues.

Environ reported that during the 1950s and 1960s, BMC manufactured alkyd resins at the Site in open, subsurface pits.  A large resin reactor was located at the Site and used through the early 1980s, and chemicals used included vinyl acetate, mineral spirits, xylenes, and trimethylbenzenes.  Because these resins were manufactured over a relatively long time period in open pits, and vinyl acetate was stored in an underground storage tank, with wastewater being released to a clarifier, it was possible that liquids used in the manufacture of the resins

---

[2] <https://www.waterboards.ca.gov/waterboards_map.html> [as of June 25, 2025], archived at <https://perma.cc/LLE4-W89L>.

contacted subsurface soil and/or groundwater underlying the Site.

Environ found that according to its prior experience in the area, groundwater is first encountered at approximately 90 to 100 feet below ground surface, and flows to the southwest. Environ was aware that groundwater in the Site vicinity was contaminated by (VOCs), primarily chlorinated solvents.

Environ did not test for TCE or PCE.

### C. Terracon Environmental Site Assessments (2002)

In 2002, BMC retained Terracon, an environmental consultant, to conduct a Phase I Environmental Site Assessment, a Limited Phase II Assessment, and soil sampling at the Site. Terracon's Phase I Assessment noted that BMC had stored drummed hazardous waste outdoors in a paved area without secondary containment measures, and mixed raw materials in "open, unlined pits," which possibly allowed liquids used in the manufacture of the paint resins to contact subsurface soils and/or groundwater underlying the Site.

Terracon conducted 11 soil borings ranging from 4 to 25 feet below ground surface (bgs) and analyzed the samples for VOCs. The VOC analyses detected acetone, ethylbenzene, toluene, xylene, 2-butanone and 4-methyl-2-pentanone in 5 of the 11 soil samples at levels below their respective "Preliminary Remediation Goals" developed by the Environmental Protection Agency (EPA). Terracon found "staining" and "[s]trong paint/solvent odors" in two of the borings and strong odors without staining in a third boring. The analyses detected no contaminant concentrations exceeding state regulatory levels, but

5

analysis of one sample indicated a possible release near the decommissioned vinyl acetate underground storage tank, and Terracon recommended further testing to assess potential soil contamination by VOCs at that location.

Terracon reported: "The groundwater flow direction and the depth to shallow groundwater, if present, would likely vary depending upon seasonal variations in rainfall and the depth to the soil/bedrock interface. Without the benefit of on-site groundwater monitoring wells surveyed to a datum, actual groundwater depth and flow direction beneath the site cannot be ascertained."

Terracon tested for but did not detect TCE or PCE in any of the 11 soil borings.

**D.     Environ Report Addressing the Underground Storage Tank (2003)**

In 2003, BMC retained Environ to prepare an environmental report to address removal of the 6,000-gallon underground vinyl-acetate storage tank, which had been decommissioned in 1983. Five soil samples were taken near the tank. Analysis of the samples by Positive Lab Service detected acetone, 2-butanone, 4-methyl-2-pentanone, naphthalene, and benzene levels "well below" their respective EPA Region IX preliminary remediation goals for industrial areas.

Of particular note, Environ detected PCE in two of the samples. Those samples, taken at depths of 19 and 4 feet below ground, contained PCE in concentrations of 46 and 16 µg/kg, respectively. Environ represented that the EPA preliminary remediation goal for PCE was 3,400 µg/kg.

6

Environ did not detect vinyl acetate, the only known compound stored in the underground storage tank, nor did it detect TCE.

On August 28, 2004, Environ reported its results to the County of Los Angeles Department of Public Works, attaching Positive Lab Service's analytical report.

### E. Department of Toxic Substances Control Waste Manifest (2004)

Sometime after 2003, the Department of Toxic Substances Control (DTSC) issued manifest tracking records for BMC. The manifest states that waste containing 0.126 and 0.504 tons of PCE was generated at the Site in 1999 and 2000.

### F. LandAmerica Report (2004)

In 2004, LandAmerica Assessment Corporation, an environmental consultant, conducted a Phase I Environmental Site Assessment of the Site and issued a report to its client, Burnham Capital Markets. LandAmerica performed no soil sampling. Based on its review of records and the reports summarized above, LandAmerica concluded there was no evidence of "recognized environmental conditions" on the Site, except in relevant part: "The Property was previously owned by Benjamin Moore & Company and utilized for the manufacturing and storage of paint materials and solvents. Subsequent environmental activities at the Property included the removal of an underground storage tank and associated soil sampling." LandAmerica advised: "Based upon topographic map interpretation and review of previous environmental reports,

groundwater flow beneath the Property is inferred to be in a south/southwesterly direction."

### G. Underground Storage Tank Review (March 2010)

In March 2010, the State of California Environmental Protection Agency assessed the underground storage tank location and reviewed Environ's 2003 environmental report regarding the tank. The EPA recommended no remediation based on its findings that: "The source of contamination has been abated as the UST has been removed"; "[t]he extent of soil contamination has been adequately defined"; "[b]ased on the soil investigation data, groundwater monitoring wells were not required"; and "[t]he residual contamination would not cause significant human health and/or environmental risks via major pathways, such as direct contact, drinking water ingestion, groundwater plume migration, and vapor intrusion."

### H. Underground Storage Tank Closure (April 2010)

In April 2010, with approval from the Regional Board, BMC formally closed and removed the decommissioned vinyl acetate underground storage tank. As part of the closure process, BMC submitted Positive Lab Service's certificate of analysis, which had been attached to the 2003 Environ report, showing that in 2003 Environ detected no TCE near the tank and had found PCE in only two samples, at concentrations of only 46 and 12 µg/kg, 19 and 4 feet below ground, respectively.

On April 14, 2010, the Regional Board closed its investigation into the underground storage tank, stating, "Based

8

on information in the above-referenced file and with the provision that the information provided to this agency was accurate and representative of site conditions, this agency finds that the site investigation and corrective action carried out at your underground tank(s) site is in compliance with the requirements of subdivision (a) and (b) of section 25296.10 of the Health and Safety Code and with corrective action regulations adopted pursuant to section 25299.3 of the Health and Safety Code and that no further action related to the petroleum release(s) at the site is required" (Closure Letter).

I.      **Chemical Use and Storage Questionnaire (2015)**

In 2015, the City of Commerce collected data from two of its drinking water wells, which showed significant spikes in the concentrations of PCE and TCE. The Regional Board then advised BMC that two wells located near the Site had been impacted by PCE and TCE and issued an investigative order directing BMC to complete a chemical use and storage questionnaire concerning its operations on the Site. The Regional Board directed BMC to include a perjury statement, signed by a senior authorized BMC representative (not by a consultant) with all reports submitted.

In response to several questions in the questionnaire asking BMC to identify all chemicals used, stored, or disposed of at the Site, including VOCs such as TCE and PCE, and also to identify the generated waste and its composition, with the approximate quantity disposed each month, BMC stated, "We sold the site on January 22, 2002. We ceased operations prior to the sale. See enclosed env. Site assessment reports."

BMC returned the completed questionnaire with copies of the 1999 Environ report, the 2002 Terracon report, the August 28, 2003 letter from Environ to the county Department of Public Works, and the 2010 Closure Letter (but without Positive Lab Service's analytical report).

BMC stated that it had used lubricating oils, dyes, rubber, paints, fertilizers, and solvents at the Site. When asked whether there had "ever been a release of chemicals to the ground surface or subsurface," BMC answered affirmatively and added the notation "UST," referring to the 6,000-gallon vinyl acetate underground storage tank. When asked about its use or storage of VOCs, BMC referred to the attached environmental assessment reports.

### J.    Golder Report (2020)

In 2018, the Regional Board advised BMC that evidence indicated there was or had been a waste discharge from the Site. The board cited the environmental assessment reports from BMC's prior investigations and advised that it was considering corrective action. The board directed BMC to investigate whether and to what extent VOCs may have impacted the soil and underlying groundwater at the Site.

BMC retained an environmental consulting firm, Golder Associates Inc., to "conduct additional investigations to delineate VOCs, including PCE and TCE" on the Site. Golder reviewed BMC's operations and the environmental investigations and reports summarized above but conducted no additional soil sampling. Golder observed that Terracon's 2002 environmental assessment detected VOCs at concentrations below screening levels but detected no TCE or PCE in any sample collected.

Golder observed that the 2003 Environ assessment detected PCE at concentrations of 46 and 12 µg/kg in two soil samples collected beneath the former underground storage tank, but those concentrations were significantly lower than the industrial PRG of 3,400 µg/kg, and also lower than "today's more stringent Tier 1 Environmental Screening Level of 80 µg/kg established by the San Francisco Regional Water Quality Control Board."

Golder opined that with no detection of PCE or VOCs other than at the two positive sample locations, PCE contamination was limited to those locations. No evidence suggested BMC was the source of PCE and TCE in groundwater in the vicinity of the Site, Golder concluded, because: (1) BMC did not use chlorinated solvents; (2) all detected VOC and PCE concentrations were below screening levels; (3) TCE was never detected; (4) "the lateral and vertical extent of PCE has been delineated at the Site," and was limited to two sample locations; and (5) review of documents for adjacent sites indicates there were other sources of VOCs in the regional aquifer.

## II.     Regional Board Investigative Order (2021)

On June 1, 2021, the Regional Board issued Order No. R4-2021-0069 (the Order), directing BMC to provide a "work plan for subsurface investigation." It stated that BMC's response to the 2015 chemical use and storage questionnaire indicated that operations conducted on the Site had resulted in the discharge of waste into the subsurface environment and contamination by elevated levels of VOCs, the extent of which was "not fully defined."

11

The Investigation Order directed BMC to "prepare and submit a technical report/work plan" providing: (1) "[D]etailed information on any waste buried at the Site during the decommissioning of the [BMC] facility in 2001," including the "type, composition, and volume of the waste as well as the exact location(s) and depth of the buried waste and other relevant information"; and (2) a "work plan for complete site assessment," including extensive soil and gas sampling and analysis. The work plan would address all areas of concern, including the former solvent and drum storage areas, clarifier area, storage tank areas, loading docks, railroad spurs, and fire suppression area. The order contemplated that the cost of the technical report would range between $50,000 and $800,000.

In support of the Order, the Regional Board cited Environ's 1999 and 2003 reports, Terracon's 2002 report, and a New York Post article stating that BMC's former in-house counsel had filed a lawsuit against BMC in which he alleged BMC secretly buried hazardous waste on the Site in 2001. The order asserted that the burden of the required report bore a reasonable relationship to the Regional Board's need for it and the benefits to be obtained.

## III.   BMC's Challenges to the Investigation Order

On July 1, 2021, BMC filed a petition with the State Water Board seeking review of the Order and requesting a stay of the order. The State Water Board took no action on BMC's petition, and it was automatically dismissed by operation of law on January 31, 2022.

12

On September 28, 2021, BMC submitted a proposed work plan to the Regional Board, which the Water Board rejected on October 27, 2021.[3]

On March 2, 2022, BMC filed a petition for writ of mandate in the superior court seeking issuance of an administrative writ directing the Regional Board to set aside the Order.

On December 16, 2022, BMC moved to augment the administrative record with multiple exhibits on the ground that the Regional Board refused to include additional relevant documents in the administrative record. Among the documents BMC moved to include in the record was a 2020 DTSC Screening Assessment, in which the agency recommended no action at the Site after an investigation. BMC sought to include the Screening Assessment because the Regional Board supported its arguments with the "Public Attachments" to the Screening Assessment while excluding the DTSC's exculpatory interpretation of that information. The trial court denied BMC's motion on the ground that the documents were irrelevant because the Regional Board had not considered them before issuing the Order.

After a hearing on the merits of BMC's petition, the court found: (1) The Regional Board detected increased levels of PCE and TCE at two wells located near the Site, one of which was

_____

[3] According to the trial court's order, BMC later submitted a second proposed work plan to comply with the order. The board rejected the plan in a June 15, 2023 letter which stated, "The above requirement for submittal of a technical report constitutes an amendment to the requirements of the Water Code section 13267 Order originally dated June 1, 2021." The record on appeal does not contain the proposed work plan or June 15, 2023 letter. We thus have no way to review any amendment to the Investigation Order.

13

directly adjacent to the northeastern corner of the Site; (2) the 2004 DTSC waste manifest indicated that waste containing 0.126 and 0.504 tons of PCE was generated at the Site in 1999 and 2000; (3) the 1999 and 2003 Environ reports, 2002 Terracon report, and 2004 LandAmerica report indicated that PCE and other VOCs were detected at the Site, and although the levels detected were low, BMC had not conducted a comprehensive investigation, including sampling from lower soil depths; and (4) the pattern of BMC's operations—including stored drummed hazardous waste on asphalt without secondary containment, storage of solvents in 23 above ground storage tanks, and failure to keep material safety data sheets outlining the cleaning solvents it used to maintain equipment, all of which occurred in areas not yet fully evaluated for contamination—suggested the possibility of waste discharge that could impact water quality.

The court disapproved of BMC's responses to the Regional Board's chemical use and storage questionnaire, which failed to disclose information about its waste generation under penalty of perjury and failed to explain the DTSC manifest showing that the Site generated PCE in 1999 and 2000.

The court found that the California EPA's 2010 assessment of the underground storage tank location, finding insignificant contamination, and the Regional Board's 2010 Closure Letter, finding BMC in compliance with the Health and Safety Code, were not dispositive because they related to only a small portion of the Site, the underground storage tank area, and relied on information supplied solely by BMC.

Regarding the 2020 DTSC's Screening Assessment that BMC had unsuccessfully moved to be included in the administrative record, the court found that BMC had "not

14

developed a persuasive argument that the DTSC's Pre-CERCLA Screening Assessment, dated April 20, 2020, materially undermines Respondent's findings," and "[e]ven if Petitioner had shown the record should be augmented with that document . . . , the court would reach the same result in weighing the evidence."

The court found that no evidence indicated it would be overly burdensome for BMC to comply with the first part of the Order, to provide information about waste BMC buried at the Site, nor the second part, to prepare a work plan for complete site assessment.

The court found that the weight of the evidence supported the Regional Board's suspicion that BMC had potentially discharged waste from the Site that could affect the quality of water in the region, and further supported the board's finding that the burden of the required information bore a reasonable relationship to the Regional Board's need for it and the benefits to be obtained.

The court thereupon denied BMC's petition.

This appeal followed.

## DISCUSSION

## I.    Sufficiency of the Evidence

BMC contends no substantial evidence supports the Regional Board's Investigation Order.  But that is not our inquiry on appeal.  In reviewing a superior court finding that the weight of the evidence supports a regional board's order under Water Code section 13267, we determine whether substantial evidence supports the court's finding, not the regional board's order.[4]

_____

[4] Undesignated statutory references are the Water Code.

15

## A.     Legal Principles

A regional water quality control board "may investigate the quality of any waters of the state within its region." (§ 13267, subd. (a).)  In doing so, the regional board "may require that any person who has discharged . . . or is suspected of having discharged . . . waste within its region . . . that could affect the quality of waters within its region [to] furnish . . . technical or monitoring program reports which the regional board requires." (*Id.*, subd. (b)(1).)

"The burden, including costs, of these reports shall bear a reasonable relationship to the need for the report and the benefits to be obtained from the reports.  In requiring those reports, the regional board shall provide the person with a written explanation with regard to the need for the reports, and shall identify the evidence that supports requiring that person to provide the reports." (§ 13267, subd. (b)(1).)

A person aggrieved by an order of a regional water quality control board may petition the State Water Board to review the order.  (Wat. Code, § 13320, subd. (a).)  A party aggrieved by the State Water Board's final decision on such a petition may petition the superior court for a writ of administrative mandate pursuant to section 1094.5 of the Code of Civil Procedure to review the action.  (Wat. Code, § 13330, subds. (b) & (e).)

"The inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion.  Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the

16

findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b).)

In an inquiry into the action of a regional water board, the court shall exercise its independent judgment on the evidence. (Wat. Code, § 13330, subd. (e).)  In such a case, "abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence."  (Code Civ. Proc., § 1094.5, subd. (c).)  "[I]n weighing the evidence the courts can and should be assisted by the findings of the board.  The findings of the board come before the court with a strong presumption of their correctness, and the burden rests on the complaining party to convince the court that the board's decision is contrary to the weight of the evidence."  (*Drummey v. State Board of Funeral Directors & Embalmers* (1939) 13 Cal.2d 75, 85; see also *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 820 [same].)

In reviewing a superior court's finding that a regional board's order is supported by the weight of the evidence, we must sustain the finding if substantial evidence supports it.  (*Pasadena Unified School Dist. v. Commission on Professional Competence* (1977) 20 Cal.3d 309, 314; see also *Sweeney v. California Regional Water Quality Control Bd.* (2021) 61 Cal.App.5th 1093, 1111.)  Our power to review the court's decision thus "begins and ends with a determination of whether there is any substantial evidence—contradicted or uncontradicted—to support the trial court findings."  (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582.)  We must "resolve all conflicts in favor of the party prevailing in the superior court and must give that party the benefit of every reasonable inference in support of the judgment."  (*Davis v. Physician Assistant Bd.* (2021) 66

17

Cal.App.5th 227, 252; see also *Pasadena Unified School Dist.*, at p. 314.)

We review questions of law de novo, but "give appropriate consideration to an administrative agency's expertise underlying its interpretation of an applicable statute." (*Building Industry Assn. of San Diego Cty. v. State Wat. Res. Control Bd.* (2004) 124 Cal.App.4th 866, 879, fn. omitted.)

We review a motion to augment the administrative record for abuse of discretion. (*Pomona Valley Hospital Medical Center v. Superior Court* (1997) 55 Cal.App.4th 93, 101 (*Pomona Valley Hospital*).)

### B. Application
#### 1. Reasonable Suspicion of Contamination

Section 13267 authorizes the Regional Board to require environmental reports from a person or entity "suspected of having discharged" contaminants that "could affect" waters within the board's region.

Here, water analyses indicated that two groundwater monitoring wells near BMC's facility were contaminated with TCE and PCE. One well was directly adjacent to the Site.

BMC's environmental reports showed that BMC manufactured paint and solvent-based coatings on the Site between 1953 and 2002, and as part of its operations stored drummed hazardous waste on asphalt without secondary containment, stored solvents in 23 aboveground storage tanks, used mixing, "letdown," and holding tanks; and used a 6,000-gallon underground tank for vinyl acetate storage and a 2,500-gallon spill retention/clarifier tank.

18

A 2004 DTSC waste manifest indicated that waste containing 0.126 and 0.504 tons of PCE was generated at the Site in 1999 and 2000, respectively, which BMC inexplicably failed to disclose in 2015 when responding to the Regional Board's chemical use and storage questionnaire directing BMC to identify all chemicals or substances used, stored, or disposed of at the Site, including VOCs such as TCE and PCE, and to identify the generated waste and its composition, with the approximate quantity disposed each month.

In one of BMC's responses, it admitted that there had been releases of chemicals to the ground surface or subsurface in association with the 6,000-gallon vinyl acetate underground storage tank.

Four environmental assessment reports, from Environ in 1999 and 2003, Terracon in 2002, and LandAmerica in 2004, indicated that areas of concern included a solvent storage warehouse, a storage shed, a bermed drum storage area, a clarifier, three-tank farms, a loading dock, a fire suppression above-ground storage tank, and a railroad spur into the Site, all of which were known to be areas where contamination may have occurred and none of which have ever been fully assessed.

PCE and other VOC contamination was detected at the Site, and although the contaminants were present at low levels and shallow depths, no evidence suggested that BMC ever conducted a comprehensive investigation that included sampling from lower soil depths.

In sum, the evidence showed:  Regional waters were contaminated with TCE and PCE; BMC ran a nearby operation that handled contaminants in several discrete areas on the Site; some minor soil contamination occurred in one area of operation;

19

BMC concealed the waste manifest records showing generation of PCE at the Site; and BMC conducted significant environmental assessment in only one area of operation on the Site, and even then at only shallow soil depths. From this evidence the Regional Board could reasonably suspect that BMC discharged contaminants that could affect waters within the board's region.

To be sure, there was significant countervailing evidence as well: None of the several environmental assessments discovered TCE; only one assessment discovered PCE, at only low levels, in only two shallow soil samples dozens of feet away from the water table; the Regional Board and California EPA found no adverse environmental impact from BMC's operations; review of documents for adjacent sites indicated there were other nearby sources of VOCs in the regional aquifer; some evaluators opined that the water table flows from the direction of the contaminated wells to the Site rather than from the Site to the wells; and Golder, an environmental consultant, opined that PCE contamination was limited to one shallow location and did not impact groundwater.

But on appeal we may not reweigh the evidence. We conclude substantial evidence underlies the court's finding that the weight of the evidence supported the Regional Board's suspicion that BMC contaminated nearby groundwater.

BMC argues the evidence was insufficient as a matter of law to support a suspicion that it contaminated wells with TCE or PCE, for several reasons.

First, BMC argues, the wells were offsite and upgradient of the site. But no hydrological report or opinion indicates that the well adjacent to the Site was upgradient from it, and none supports BMC's premise that a downgradient polluter cannot

20

contaminate an upgradient well.  Does pollution flow only downgradient through the Earth's subsurface?  Does groundwater flow only in one direction?  Terracon noted the uncertainty, reporting, "The groundwater flow direction and the depth to shallow groundwater, if present, would likely vary depending upon seasonal variations in rainfall and the depth to the soil/bedrock interface.  Without the benefit of on-site groundwater monitoring wells surveyed to a datum, actual groundwater depth and flow direction beneath the site cannot be ascertained."  Thus, even if the wells were upgradient, no evidence established that pollution on the Site could not impact groundwater in the area.

BMC argues that off-Site underground water contamination observed in 2006, six years after BMC's operations ceased at the Site, cannot tend in reason to suggest that BMC's operations caused the contamination.  BMC cites no evidence to support the argument, and our examination of the administrative record reveals none.  BMC argues that if anything, the timing of the contamination suggests another facility caused it.  Perhaps so, but the weighing of contrary evidence was a matter for the trial court.

BMC argues the evidence was insufficient to support the Regional Board's suspicion as a matter of law because TCE has never been discovered on the Site, and PCE was discovered only in minute quantities.  This argument relies on the faulty premise that non-discovery of a pollutant at a location establishes its nonexistence there.  On the contrary, the possibility that TCE and PCE contamination occurred at the Site may be inferred from neighboring offsite contamination combined with BMC's handling of the chemicals.  That inference may be defeated by an

21

environmental assessment proving the contrary, but no such assessment has been conducted. Therefore, whether the Site is actually contaminated (or not) has not yet been established.

BMC argues that the Regional Board's 2010 Closure Letter, in which it stated that "[b]ased on information in the above-referenced file and with the provision that the information provided to this agency was accurate and representative of site conditions, . . . the site investigation and corrective action carried out at your underground tank(s) site is in compliance with the [section 25296.10 of the Health and Safety Code] . . . and that no further action related to the petroleum release(s) at the site is required," precludes the Regional Board from ordering it to provide technical reports under Water Code section 13267 because Health and Safety Code section 25296 "addresses many potential groundwater threats, not just those related to the removed underground storage tank or petroleum." We disagree.

The letter by its own terms applied only to BMC's underground tank site and petroleum releases. Nothing in Health and Safety Code section 25296.10 obligates the Regional Board to evaluate all site operations and all possible pollutants before issuing a closure letter as to one operation and one class of pollutants.

On the contrary, subdivision (a) of Health and Safety Code section 25296.10 provides that "Each owner, operator, or other responsible party shall take corrective action in response to an unauthorized release in compliance with this chapter," *this chapter* referring to Chapter 6.7 of Division 20 of the Health and Safety Code, titled "Underground Storage of Hazardous Substances." Nothing in section 25296.10 suggests it applies to aboveground storage or handling of hazardous substances.

22

## 2. Burden

Section 13267 mandates that the burden, including costs, of reports required by a Regional Board order bear a reasonable relationship to the need for the report and the benefits to be obtained.

Here, the order directed BMC to (1) identify any waste it buried on the Site and (2) provide a work plan to comprehensively assess the site. The order did not direct BMC to conduct a comprehensive environmental assessment.

No evidence suggested, and BMC does not claim, that it would be particularly burdensome for BMC to identify its own activities in burying waste on the Site. Nor did evidence suggest that producing a work plan to comprehensively assess the site would be overly costly or burdensome. Several environmental assessments have already been performed, which would presumably lessen the expense of preparing a work plan for a more comprehensive assessment. BMC argues that a comprehensive environmental assessment of the Site would be extremely costly, but the Investigative Order did not require such an assessment.

On the other hand, evidence suggests the Regional Board needs a plan to comprehensively assess the BMC Site: An adjacent well is contaminated with a chemical BMC used on the Site; some soil on the Site is contaminated with that and other chemicals; and no comprehensive assessment has ever been performed.

We conclude that substantial evidence underlies the trial court's finding that the burden, including costs, of reports required by the Regional Board order bears a reasonable

23

relationship to the need for the reports and the benefits to be obtained.

## II. Motion to Augment the Record

BMC contends the trial court abused its discretion in denying its motion to augment the administrative record with a 2020 DTSC Screening Assessment, in which the agency recommended no action at the Site after an investigation. We disagree.

An administrative mandamus hearing is generally conducted solely on the record of proceedings before the administrative agency. (*Toyota of Visalia, Inc. v. New Motor Vehicle Bd.* (1987) 188 Cal.App.3d 872, 881.) An exception exists for "relevant evidence that, in the exercise of reasonable diligence, could not have been produced or that was improperly excluded at the hearing before respondent." (Code Civ. Proc., § 1094.5, subd. (e).) "Determination of the question of whether one of the exceptions applies is within the direction of the trial court, and the exercise of that discretion will not be disturbed unless it is manifestly abused." (*Pomona Valley Hospital*, *supra*, 55 Cal.App.4th at p. 101.)

We need not decide whether the court improperly denied BMC's motion because the DTSC Screening Assessment would not have made a difference. We will reverse a trial court order due to an error in admitting evidence only if we conclude it is reasonably probable that the trial court would have reached a result more favorable to the appellant absent the error. (*Estrada v. Royalty Carpet Mills, Inc.* (2022) 76 Cal.App.5th 685, 724.)

Here, the court found that BMC had "not developed a persuasive argument that the DTSC's Pre-CERCLA Screening

24

Assessment, dated April 20, 2020, materially undermines Respondent's findings," and "[e]ven if Petitioner had shown the record should be augmented with that document . . . , the court would reach the same result in weighing the evidence."  Given this finding, it is not reasonably probable the court would have reached a result more favorable to BMC absent the error.  And for purposes of our review, the Screening Assessment could only have weighed against the Regional Board's evidence, not refuted the evidence as a matter of law.

## III.    Quantum of Suspicion Under Section 13267

BMC contends the trial court erred by failing to require that the Regional Board show it *reasonably* suspected, based on more than speculation and "more than the hunch that the [Regional Board] advocates," that BMC discharged PCE or TCE that could affect waters within the region, as section 13267 obligated the Regional Board to do before issuing an investigative order.  We need not reach this issue because as the above discussion reveals, the Regional Board established that it issued the Investigative Order based on more than speculation and a hunch.

## DISPOSITION

The judgment is affirmed.  Respondent is to recover its costs on appeal.

NOT TO BE PUBLISHED

M. KIM, J.

We concur:

ROTHSCHILD, P. J.

WEINGART, J.